1  **KASHA K. POLLREISZ**
   California State Bar No. 204148
2  **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
   225 Broadway, Suite 900
3  San Diego, California  92101-5030
   Telephone:  (619) 234-8467, Ext. 3737
4  Facsimile: (619) 687-2666
   Kasha_Pollreisz@fd.org
5

6  Attorneys for Mr. Camacho-Melendez

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10            (**HONORABLE WILLIAM Q. HAYES**)

11

12  UNITED STATES OF AMERICA,        )   CASE NO. 08CR0724-WQH
                                     )
13              Plaintiff,           )
                                     )   STATEMENT OF FACTS AND
14  v.                               )   MEMORANDUM OF POINTS AND
                                     )   AUTHORITIES IN SUPPORT OF
15  JOSE ELIAS CAMACHO-MELENDEZ,     )   DEFENDANT'S MOTIONS
                                     )
16              Defendant.           )
    _____ )
17

18                    **I.**

19            **STATEMENT OF FACTS**

20       **1.    Primary**

21       On February 27, 2008, at approximately 4:20 a.m., Jose Camacho-Melendez arrived at the

22  Calexico, West Port of Entry.  He was driving a Ford F-250 pick up truck.  He handed his lawfully

23  issued DSP-150 card to the primary inspector for identification.  The primary inspector asked

24  Mr. Camacho-Melendez where he was going and who owned the pick up truck.  Mr. Camacho-

25  Melendez told the inspector he was going to Las Palmas in Calexico, California to purchase washers

26  and that the vehicle was the company's truck.  The inspector referred the vehicle to secondary

27  inspection.

28

1

### 2. Secondary

At secondary inspection Mr. Camacho-Melendez was asked again where he was going and if the vehicle belonged to him. Mr. Camacho-Melendez once again explained that he was going to buy washers and the pick up truck belonged to the company he worked for. The officer asked Mr. Camacho-Melendez to open the hood. Mr. Camacho-Melendez unlatched the hood release from inside the vehicle and proceeded to the secondary lobby to pay for the user fees.

The officer opened the hood to the truck and noticed two bodies inside of the engine compartment. The officer closed the hood immediately and ran tot he vehicle secondary lobby to stop Mr. Camacho-Melendez. The officer caught up with Mr. Camacho-Melendez just inside the lobby doors. The officer pushed Mr. Camacho-Melendez against the wall and conducted a patdown. The officer placed Mr. Camacho in an "escort hold" and brought him to a holding cell.

After returning to the pick up truck, the officer had a canine search the vehicle. The canine alerted to the vehicle. The hood was raised and two female undocumented aliens were seen inside the engine compartment lying on the top of the fender wells of the truck. The officers removed the aliens from the truck. The officers asked one alien, Audelia Torres Guiterrez, if she was alright in both English and Spanish. Ms. Torres just looked back at him and said nothing. The shoes Ms. Torres was wearing was smoking from the heels. She was carried into the office and given water.

### 3. Questioning

Mr. Camacho-Melendez was read his Miranda rights. After stating he understood his rights, he invoked his right to remain silent and stated he would not answer questioning without the benefit of counsel.

Material Witness, Angelica Reyes-Valenzuela was questioned. She admitted to being a citizen of Mexico with no legal entry documents to enter the United States. Ms. Reyes stated that the man that traveled with her and her friend to Mexicali, Mexico, made the smuggling arrangements. Ms. Reyes stated that her and her friend, Audelia Torres-Gutierrez, arrived on Monday, February 25, 2008, to Mexicali, Mexico. Ms. Reyes stated that her and her friend took a bus from the airport to Plaza Cachanilla and there by McDonalds a man picked them up. Ms. Reyes

1  stated they were taken to a house and just waited.  She also stated that her and her friend were then

2  taken to another house where she was told to get in the engine compartment.

3       Ms. Reyes was presented with a photo lineup.  Ms. Reyes was unable to recognize any one

4  from the photos.  She was then taken to El Centro Regional Medical Center by ambulance doe to

5  burns on her right foot.  She was medically cleared with a diagnosis of second degree burns to her

6  right foot.

7       Material witness, Audelia Torres-Gutierrez, was questioned.  She admitted to being a citizen

8  of Mexico with no legal right to remain in the United States.  Ms. Torres stated that she and

9  Ms. Reyes arrived by plane to Mexicali, Mexico, on February 25, 2008, and that they stayed at a

10  hotel.  Ms. Torres claims that on the morning of February 27, 2008, she and Ms. Reyes went to a

11  store and had breakfast.  Ms. Torres claims that she asked around when she got to the store if there

12  was someone that could pass her into the United States.  Ms. Torres stated that some men told her

13  they would cross her and Ms. Reyes into the United States and for them to meet at the hotel.  Once

14  at the hotel, Ms. Torres stated that she and Ms. Reyes were told to get into the pick up engine

15  compartment and that everything will be fine.

16       Ms. Torres was presented with a photo line-up.  Ms. Torres was unable to recognize anyone

17  from the photos.  Ms. Torres was also taken to the hospital.  She was diagnosed with first and second

18  degree burns and then released.

19       Immigration records reveal that Ms. Torres has had encounters with immigration in the past.

20  10/17/2000 - Counterfeit I-512 Expedited Removal - 5 years

21  10/19/2000 - Imposter to an I-551 Voluntary Removal

22  10/19/2000 - Impostor to an I-551 Expedited Removal 20 years

23  **3.  Grand Jury and Indictment**

24       On March 12, 2008, an indictment was filed charging Mr. Camacho-Melendez with bringing

25  in aliens for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); and bringing illegal aliens

26  without presentation in violation of 8 U.S.C. § 1324(a)(2)(B)(iii).

27

28

**II.**

**MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE**

At this time Mr. Camacho-Melendez has received **55 pages** of discovery. Mr. Camacho-Melendez requests the following discovery. His request is not limited to those items that the prosecutor knows of. It includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies." See United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989).

(1) Brady Material. The defendant requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which affects the credibility of the government's case. Under Brady, impeachment as well as exculpatory evidence falls within the definition of evidence favorable to the accused. United States v. Bagley, 473 U.S. 667 (1985); United States v. Agurs, 427 U.S. 97 (1976).

(2) Any Proposed 404(b) Evidence. The government must produce evidence of prior similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior convictions which would be used to impeach as noted in Fed. R. Crim. P. 609. In addition, under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at trial. The defendant requests such notice two weeks before trial in order to give the defense time adequately to investigate and prepare for trial.

(3) Evidence Seized. The defendant requests production of evidence seized as a result of any search. Fed. R. Crim. P. 16(a)(1)(E). He wishes to inspect the evidence before trial. **Specifically, the defense requests the opportunity to inspect the Ford pickup, seized in this case.** See Section III, below. **A preservation order is attached below for this Court's signature.**

(4) Request for Preservation of Evidence. The defendant specifically requests the preservation of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and which relate to the arrest or the events leading to the arrest in this case. This request includes, but is not limited to, any samples of narcotics used to run any scientific tests, any narcotics, the results of any fingerprint analysis, the vehicle which

1  the defendant drove, the defendant's personal effects, and any evidence seized from the defendant

2  or any third party.

3      In addition, Mr. Camacho-Melendez specifically requests that the Assistant United States

4  Attorney assigned to this case oversee a review of all personnel files of each agent involved in the

5  present case for impeachment material. <u>Kyles v. Whitley</u>, 115 S. Ct. 1555 (1995); <u>United States v.</u>

6  <u>Henthorn</u>, 931 F.2d 29 (9th Cir. 1991); <u>but see</u> <u>United States v. Herring</u>, 83 F.3d 1120 (9th Cir.

7  1996).

8      (5)  <u>Tangible Objects</u>.  The defendant seeks to inspect and copy as well as test, if necessary,

9  all other documents and tangible objects, including photographs, books, papers, documents,

10 fingerprint analyses, vehicles, or copies of portions thereof, which are material to the defense or

11 intended for use in the government's case-in-chief or were obtained from or belong to the defendant.

12 Fed. R. Crim. P. 16(a)(1)(E).  Specifically, Mr. Camacho-Melendez requests color copies of all

13 photographs in the government's possession of the aliens and the vehicle in which the aliens were

14 found.  It is defense counsel's experience that black-and-white copies do not accurately depict the

15 photographs retained by the government.  **A preservation order is attached below for this court**

16 **to sign.**

17     (6)  <u>Expert Witnesses</u>.  The defendant requests the name, qualifications, and a written

18 summary of the testimony of any person that the government intends to call as an expert witness

19 during its case in chief. Fed. R. Crim. P. 16(a)(1)(G).   This request includes, but is not limited to,

20 disclosure of the qualifications of any government witness who will testify that he understands

21 and/or speaks Spanish or any other foreign language that may have been used during the course of

22 an interview with Mr. Camacho-Melendez or any other witness.

23     (7)  <u>Evidence of Bias or Motive to Lie</u>.  The defendant requests any evidence that any

24 prospective government witness is biased or prejudiced against the defendant, or has a motive to

25 falsify or distort his testimony.

26     (8)  <u>Impeachment Evidence</u>.  The defendant requests any evidence that any prospective

27 government witness has engaged in any criminal act, whether or not resulting in a conviction, and

28

1    whether any witness has made a statement favorable to the defendant. See Fed. R. Evid. 608, 609

2    and 613; Brady v. Maryland.

3         (9)    Evidence of Criminal Investigation of Any Government Witness.    The defendant

4    requests any evidence that any prospective witness is under investigation by federal, state or local

5    authorities for any criminal conduct.

6         (10) Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.

7    The defense requests any evidence, including any medical or psychiatric report or evaluation, that

8    tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the

9    truth is impaired, and any evidence that a witness has ever used narcotics or other controlled

10   substance, or has ever been an alcoholic.

11        (11)    Witness Addresses.    The defendant requests the name and last known address of each

12   prospective government witness.    The defendant also requests the name and last known address of

13   every witness to the crime or crimes charged (or any of the overt acts committed in furtherance

14   thereof) who will not be called as a government witness.

15        (12)    Name of Witnesses Favorable to the Defendant.    The defendant requests the name of

16   any witness who made an arguably favorable statement concerning the defendant.

17        (13)    Statements Relevant to the Defense.    The defendant requests disclosure of any

18   statement relevant to any possible defense or contention that he might assert.

19        (14)    Jencks Act Material.    Mr. Camacho-Melendez requests production in advance of the

20   motion hearing or trial of all material, including dispatch tapes, that the government must produce

21   pursuant to the Jencks Act, 18 U.S.C. § 3500 and Fed. R. Crim. P. 26.2.    A verbal acknowledgment

22   that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report

23   or notes to qualify as a statement under section 3500(e)(1).    Campbell v. United States, 373 U.S.

24   487, 490-92 (1963); see also United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) (holding that

25   interview notes constitutes Jencks material when an agent reviews notes with the subject of the

26   interview); see also United States v. Riley, 189 F.3d 802, 806-808 (9th Cir. 1999).    Advance

27   production will avoid the possibility of delay of the motion hearing or trial to allow Mr. Camacho-

28   Melendez to investigate the Jencks material.    Mr. Camacho-Melendez requests pre-trial disclosure

1  of such statements to avoid unnecessary recesses and delays and to allow defense counsel to prepare

2  for, and use properly any Jencks statements during cross-examination.

3      (15)  <u>Giglio Information</u>.  Under <u>Giglio v. United States</u>, 405 U.S. 150 (1972), the defendant

4  requests all statements and/or promises, express or implied, made to any government witnesses, in

5  exchange for their testimony in this case, and all other information which could arguably be used

6  for the impeachment of any government witnesses.

7      (16)  <u>Scientific and Other Information</u>.  To the extent not already provided, the defendant

8  requests  the results of any scientific or other tests or examinations, including testing done on the

9  alleged marijuana.  <u>See</u> Rule 16(a)(1)(F).

10     (17)  <u>Informants and Cooperating Witnesses</u>.  The defense requests disclosure of the name(s),

11  address(es), and location(s) of all informants or cooperating witnesses used or to be used in this case,

12  and in particular, disclosure of any informant who was a percipient witness in this case or otherwise

13  participated in the charged crime.  <u>Roviaro v. United States</u>, 353 U.S. 52, 61-62 (1957).  The

14  government must disclose any information derived from informants which exculpates or tends to

15  exculpate the defendant.  <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The government must disclose

16  any information indicating bias on the part of any informant or cooperating witness.  <u>Id.</u>

17     (18)  <u>Personnel Records of Government Officers Involved in the Arrest</u>.  Mr.  Camacho-

18  Melendez specifically requests all citizen complaints and other related internal affairs documents

19  involving any of the Customs officers or other law enforcement officers who were involved in the

20  investigation, arrest and interrogation of his, pursuant to <u>Pitchess v. Superior Court</u>, 11 Cal. 3d 531,

21  539 (1974).  Because of the sensitive nature of these documents, defense counsel will not be able

22  to procure them from any other source.

23     (19) <u>Government Examination of Law Enforcement Personnel Files</u>.  The defendant requests

24  that the Government examine the personnel files and any other files within its custody, care or

25  control, or which could be obtained by the government, for all testifying witnesses, including

26  testifying officers.  He requests that these files be reviewed by the Government attorney for evidence

27  of perjurious conduct or other like dishonesty, or any other material relevant to impeachment, or any

28  information that is exculpatory, pursuant to its duty under <u>United States v. Henthorn</u>, 931 F.2d 29

1    (9th Cir. 1991).  Only the prosecutor has the legal knowledge and ethical obligations to fully comply

2    with this request.

3    (20)  <u>Training of Border Patrol and ICE Agents.</u>  The defendant requests copies of any and

4    all written policies and/or training manuals issued by the Department of Homeland Security to their

5    employees regarding:  (1) the handling of vehicles suspected to be transporting illegal aliens near

6    the border; (2) the detention of individuals within those vehicles suspected of carrying aliens; and

7    (3) the search of those vehicles and the occupants of those vehicles.

8    (21)  <u>TECS Reports</u>.  Mr. Camacho-Melendez requests all TECS reports, including reports

9    pertaining to all vehicle border crossings pertaining to the vehicle used in this case and any vehicles

10    pertaining to Mr. Camacho-Melendez.  Any prior border crossings are considered "other acts"

11    evidence which the government must produce before trial.  <u>Vega</u>, 188 F.3d at 1154.  Furthermore,

12    Mr. Camacho-Melendez puts the government on notice that prior border crossings may tend to

13    exculpate Mr. Camacho-Melendez, making evidence of these crossings discoverable under <u>Brady</u>,

14    373 U.S. 83.

15    (22)  <u>Residual Request</u>.  Mr. Camacho-Melendez intends by this discovery motion to invoke

16    his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure

17    and the Constitution and laws of the United States.  Mr. Camacho-Melendez requests that the

18    government provide him with the above requested material sufficiently in advance of trial to avoid

19    unnecessary delay prior to cross-examination.

20    Mr. Camacho-Melendez requests that the government provide him and his attorney with the

21    above requested material well in advance of motions hearings and trial.  This lead time is necessary

22    in order for defense counsel to effectively investigate this case and assist Mr. Camacho-Melendez

23    in preparing his defense.

24

25

26

27

28

1

**III.**

2

3

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING Mr. CAMACHO-MELENDEZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

4

5

**A.    Introduction.**

6

The indictment in the instant case was returned by the January 2007 grand jury. That grand

7

jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on January

8

11, 2007. <u>See</u> Reporter's Transcript of the Proceedings, dated January 11, 2007, a copy of which

9

is attached hereto as Exhibit A. Judge Burns's instructions to the impaneled grand jury deviate from

10

the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction

11

previously given in this district in several ways.[1] These instructions compounded Judge Burns's

12

erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury

13

panel, which immediately preceded the instructions at Ex. A. <u>See</u> Reporter's Transcript of

14

Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[2]

15

16

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

17

18

After repeatedly emphasizing to the grand jurors that probable cause determination was their

19

sole responsibility, <u>see</u> Ex. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were

20

forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether

21

or not there should be a federal law or should not be a federal law designating certain activity [as]

22

23

[1] <u>See</u>, <u>e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States v. Navarro-Vargas</u>, 408 F.3d 1184 (9th Cir.) (<u>en banc</u>), cert. denied, 126 S. Ct. 736 (2005) (<u>Navarro-Vargas II</u>); <u>United States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-Vargas I</u>); <u>United States v. Marcucci</u>, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

24

25

26

27

28

[2] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. Camacho-Melendez requests that the video presentation be produced. <u>See</u> <u>United States v. Alter</u>, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[3] <u>See also</u> <u>id.</u> at 20 ("You're all about probable cause.").

08cr0724-WQH

1  criminal is not up to you." <u>See</u> <u>id.</u> at 8.  The instructions go beyond that, however, and tell the grand

2  jurors that, should "you disagree with that judgment made by Congress, then your option is not to

3  say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or

4  'I'm going to vote in favor of even though the evidence may be insufficient.'" <u>See</u> <u>id.</u> at 8-9.  Thus,

5  the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree

6  with a proposed prosecution.

7       Immediately before limiting the grand jurors' powers in the way just described, Judge Burns

8  referred to an instance in the grand juror selection process in which he excused three potential jurors.

9  <u>See</u> <u>id.</u> at 8.

10      I've gone over this with a couple of people.  You understood from the questions and
   answers that a couple of people were excused, I think three in this case, because they
11      could not adhere to the principle that I'm about to tell you.

12  <u>Id.</u>  That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to

13  their disagreement with Congress.  <u>See</u> <u>id.</u> at 8-9.  Thus, Judge Burns not only instructed the grand

14  jurors on his view of their discretion; he enforced that view on pain of being excused from service

15  as a grand juror.

16       Examination of the voir dire transcript, which contains additional instructions and

17  commentary in the form of the give and take between Judge Burns and various prospective grand

18  jurors, reveals Judge Burns's emphasis on the singular duty to determine whether or not probable

19  cause exists, and his statement that grand jurors cannot judge the wisdom of the criminal laws

20  enacted by Congress merely compounded an erroneous series of instructions already given to the

21  grand jury venire.  In one of his earliest substantive remarks, Judge Burns makes clear that the grand

22  jury's sole function is probable cause determination.

23      [T]he grand jury is determining really two factors: "do we have a reasonable belief
   that a crime was committed?  And second, do we have a reasonable belief that the
24      person that they propose that we indict committed the crime?"

25      If the answer is "yes" to both of those, then the case should move forward.  If the
   answer to either of the questions is "no," then the grand jury should not hesitate and
26      not indict.

27  <u>See</u> Ex. B at 8.  In this passage, Judge Burns twice uses the term "should" in a context makes clear

28  that the term is employed to convey instruction: "should" cannot reasonably be read to mean

1   optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief

2   that a crime was committed" or if it has no "reasonable belief that the person that they propose that

3   we indict committed the crime."

4        Equally revealing are Judge Burns's interactions with two potential grand jurors who

5   indicated that, in some unknown set of circumstances, they might decline to indict even where there

6   was probable cause. Because of the redactions of the grand jurors' names, Mr. Camacho-Melendez

7   will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the

8   other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be

9   considered illegal and that some drug prosecutions were not an effective use of resources. See id.

10  at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

11       Judge Burns made no effort to determine what sorts of drug and immigration cases troubled

12  the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually

13  filed in this district, such as drug smuggling cases and cases involving reentry after deportation and

14  alien smuggling. Rather, he provided instructions suggesting that, in any event, any scruples CSW

15  may have possessed were simply not capable of expression in the context of grand jury service.

16       Now, the question is can you fairly evaluate [drug cases and immigration cases]?
         Just as the defendant is ultimately entitled to a fair trial and the person that's accused
17       is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too,
         is the United States entitled to a fair judgment. If there's probable cause, then the
18       case should go forward. *I wouldn't want you to say,* "well, yeah, there's probable
         cause, but I still don't like what our government is doing. I disagree with these laws,
19       so I'm not going to vote for it to go forward." If that is your frame of mind, the
         probably you shouldn't serve. Only you can tell me that.
20

21  See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let

22  the grand juror know that he would not want him or her to decline to indict in an individual case

23  where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there

24  was probable cause. See id. Such a case "should go forward." See id. Given that blanket

25  proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the

26  CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the

27  evidence warranted it." See id. Again, Judge Burns's question provided no context; he inquired

28  regarding "a case," a term presumably just as applicable to possession of a small amount of medical

1  marijuana as kilogram quantities of methamphetamine for distribution.  Any grand juror listening

2  to this exchange could only conclude that there was *no* case in which Judge Burns would permit

3  them to vote "no bill" in the face of a showing probable cause.

4      Just in case there may have been a grand juror that did not understand his or her inability to

5  exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange

6  with REA.  REA first advised Judge Burns of a concern regarding the "disparity between state and

7  federal law" regarding "medical marijuana."  See id. at 24.  Judge Burns first sought to address

8  REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply

9  forbidden from taking penalty considerations into account.

10      Well, those things -- the consequences of your determination shouldn't concern you
        in the sense that penalties or punishment, things like that -- we tell trial jurors, of
11      course, that they cannot consider the punishment or the consequence that Congress
        has set for these things.  We'd ask you to also abide by that.  We want you to make
12      a business-like decision of whether there was a probable cause. . . .

13  Id. at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors, Judge

14  Burns went on to suggest that REA recuse him or herself from medical marijuana cases.  See id. at

15  25.

16      In response to further questioning, REA disclosed REA's belief "that drugs should be legal."

17  See id.  That disclosure prompted Judge Burns to begin a discussion that ultimately led to an

18  instruction that a grand juror is obligated to vote to indict if there is probable cause.

19      I can tell you sometimes I don't agree with some of the legal decisions that are
        indicated that I have to make.  But my alternative is to vote for someone different,
20      vote for someone that supports the policies I support and get the law changed.  It's
        not for me to say, "well, I don't like it.  So I'm not going to follow it here."
21
        You'd have a similar obligation as a grand juror even though you might have to grit
22      your teeth on some cases.  Philosophically, if you were a member of congress, you'd
        vote against, for example, criminalizing marijuana.  I don't know if that's it, but
23      you'd vote against criminalizing some drugs.

24      That's not what your prerogative is here.  You're prerogative instead is to act like a
        judge and say, "all right.  This is what I've to deal with objectively.  Does it seem to
25      me that a crime was committed?  Yes.  Does it seem to me that this person's
        involved?  It does."  *And then your obligation, if you find those to be true, would be*
26      *to vote in favor of the case going forward.*

27  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test,

28  which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

1    Having set forth the duty to indict, and being advised that REA was "uncomfortable" with

2  that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the

3  obligation to indict in every case in which there was probable cause.

4           The Court: Do you think you'd be inclined to let people go in drug
            cases even though you were convinced there was probable cause they
5           committed a drug offense?
            REA: It would depend on the case.
6           The Court: Is there a chance that you would do that?
            REA: Yes.
7           The Court: I appreciate your answers.  I'll excuse you at this time.

8  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely

9  on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case,"

10 see id., as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that

11 REA would vote to indict in some (perhaps many or even nearly all) cases in which there was

12 probable cause.  Again, Judge Burns made no effort to explore REA's views; he did not ascertain

13 what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what

14 type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the

15 "obligation" is "to vote in favor of the case going forward."[4]  See id. at 27.  That is why even the

16 "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

17

18

19

20

21

22

23

24

25        [4] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate
26 judge will have determined the existence of probable cause "in most circumstances" before it has
   been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding
27 probable cause in each case because had a magistrate judge not so found, the case likely would not
   have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it
28 merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction
   made the grand jury more inclined to indict irrespective of the evidence presented.

## 2. The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause. See Ex. A at 20.[5]

> Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14,

---

[5] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general. Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you." See Ex. A at 27. The instructions delivered during voir dire go even further. In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys. See Ex. A at 9-10. Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, he would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1    Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball.

2    If there's something adverse or that cuts against the charge, you'll be informed of that.  They have

3    a duty to do that."  See id.  Thus, Judge Burns unequivocally advised the grand jurors that the

4    government would present any evidence that was "adverse" or "that cuts against the charge."  See

5    id.

6    **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the**
       **Powers of the Grand Jury, Which Judge Burns Far Exceeded in His**
7      **Instructions as a Whole During Impanelment.**

8         The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions

9    given to grand jurors in the Southern District of California.  See Navarro-Vargas II, 408 F.3d 1184.

10   While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of

11   adopting a highly formalistic approach[6] to the problems posed by the instructions, endorsed many

12   of the substantive arguments raised by the defendants in those cases.  The district court's instructions

13   cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II.  Taken

14   together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those

15   at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand

16   jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-

17   prosecutorial discretion.  That is not the institution the Framers envisioned.  See United States v.

18   Williams, 504 U.S. 36, 49 (1992).

19        For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-

20   Vargas II majority acknowledges that the two institutions perform similar functions: "'the public

21   prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs

22   much the same function as a grand jury.'"  Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v.

23   Economou, 438 U.S. 478, 510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900

24   (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this

25   regard "is most accurately described as prosecutorial.").  See also Navarro-Vargas II, 408 F.3d at

26

27        [6]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
28   majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
     imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
     constitutional independence.").

1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same facts.  And, significantly, the grand jury may refuse to return an indictment even "'where a conviction can be obtained.'"

Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury "controls not only the initial decision to indict, but also significant questions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the power to refuse to indict someone even when the prosecutor has established probable cause that this individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I, 367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam) (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the Ninth Circuit.  But not in Judge Burns's instructions.

1  **C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion**
2  **Established in Both *Vasquez* and *Navarro-Vargas II*.**

3     The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the
4  grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its
5  previous decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand
6  jurors indict upon every finding of probable cause because the term "should" may mean "what is
7  probable or expected."  299 F.3d at 1164 (citation omitted).  That reading of the term "should"
8  makes no sense in context, as Judge Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d
9  at 1210-11 (Hawkins, J., dissenting) ("The instruction's use of the word 'should' is most likely to
10 be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to
11 circumscribe the grand jury's constitutional independence.").  See also id. ("The 'word' should is
12 used to express a duty [or] obligation.") (quoting The Oxford American Diction and Language
13 Guide 1579 (1999) (brackets in original)).

14    The debate about what the word "should" means is irrelevant here; the instructions here
15 make no such fine distinction.  The grand jury instructions make it painfully clear that grand jurors
16 simply may not choose not to indict in the event of what appears to them to be an unfair application
17 of the law: should "you disagree with that judgment made by Congress, then your option is not to
18 say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...."
19 See Ex. A at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict because
20 they disagree with a proposed prosecution. No grand juror would read this language as instructing,
21 or even allowing, him or her to assess "the need to indict."  Vasquez, 474 U.S. at 264.

22    While Judge Burns used the word "should" instead of "shall" during voir dire with respect
23 to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is
24 clear that he could only mean "should" in the obligatory sense.  For example, when addressing a
25 prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable
26 cause, he told them that if there is not probable cause, "then the grand jury should hesitate and not
27 indict."  See id. at 8.  At least in context, it would strain credulity to suggest that Judge Burns was

28

1    using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no]

2    probable cause."  See Navarro-Vargas, 408 F.3d at 1205.  Clearly he was not.

3            The full passage cited above effectively eliminates any possibility that Judge Burns intended

4    the Navarro-Vargas spin on the word "should."

5            [T]he grand jury is determining really two factors: "do we have a reasonable belief
            that a crime was committed?  And second, do we have a reasonable belief that the
6            person that they propose that we indict committed the crime?"

7            If the answer is "yes" to both of those, then the case should move forward.  If the
            answer to either of the questions is "no," then the grand jury should not hesitate and
8            not indict.

9    See Ex. B at 8.  Of the two sentences containing the word 'should," the latter of the two essentially

10   states that if there is no probable cause, you *should* not indict.  Judge Burns could not possibly have

11   intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See

12   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the

13   grand jury's historic role of protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S.

14   338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination

15   whether there is probable cause and the protection of citizens against unfounded criminal

16   prosecutions.") (citation omitted).

17           By the same token, if Judge Burns said that "the case should move forward" if there is

18   probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable

19   cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then he would

20   have to have intended two different meanings of the word "should" in the space of two consecutive

21   sentences.  That could not have been his intent.  But even if it were, no grand jury could ever have

22   had that understanding.[7]  Jurors are not presumed to be capable of sorting through internally

23   contradictory instructions.  See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995)

24   ("where two instructions conflict, a reviewing court cannot presume that the jury followed the

25   correct one") (citation, internal quotations and brackets omitted).

26

27           [7]  This argument does not turn on Mr. Camacho-Melendez's view that the Navarro-
     Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible.
28   Rather, it turns on the context in which the word is employed by Judge Burns in his unique
     instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

1    Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it

2    explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

3        (1) The first occasion occurred in the following exchange when Judge Burns conducted voir

4    dire and excused a potential juror (CSW):

5        The Court: . . . If there's probable cause, then the case should go forward. I wouldn't
         want you to say, "Well, yeah, there's probable cause. But I still don't like what the
6        government is doing. I disagree with these laws, so I'm not going to vote for it to go
         forward." If that's your frame of mind, then probably you shouldn't serve. Only you
7        can tell me that.
         Prospective Juror: Well, I think I may fall in that category.
8        The Court: In the latter category?
         Prospective Juror: Yes.
9        The Court: Where it would be difficult for you to support a charge even if you
         thought the evidence warranted it?
10       Prospective Juror: Yes.
         The Court: I'm going to excuse you then.

11

12   See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a

13   prospective juror. Even if the prospective juror did not like what the government was doing in a

14   particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote

15   that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction

16   for the possibility of independent judgment was dismissal, a result that provided full deterrence of

17   that juror's discretion and secondary deterrence as to the exercise of discretion by any other

18   prospective grand juror.

19       (2) In an even more explicit example of what "should" meant, Judge Burns makes clear that

20   it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other

21   prerogative.

22   Court . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

23       You'd have a similar *obligation* as a grand juror even though you might have to grit
         your teeth on some cases. Philosophically, if you were a member of Congress, you'd
24       vote against, for example, criminalizing marijuana. I don't know if that's it, but
         you'd vote against criminalizing some drugs.
25
         That's not what your *prerogative* is here. Your prerogative instead is act like a judge
26       and to say, "All right. This is what I've got to deal with objectively. Does it seem
         to me that a crime was committed? Yes. Does it seem to me that this person's
27       involved? It does." *And then your obligation, if you find those things to be true,
         would be to vote in favor of the case going forward.*

28

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(3) As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when he told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

(4) And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when he reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.

1  The Court: In what regard?
   Prospective Juror: Specifically, medical marijuana.
2  The Court: Well, those things -- the consequences of your determination shouldn't
   concern you in the sense that penalties or punishment, things like that -- *we tell trial*
3  *jurors, of course, that they cannot consider the punishment or the consequence that*
   *Congress has set for these things. We'd ask you to also abide by that.* We want you
4  to make a business-like decision of whether there was a probable cause. ...

5  See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable

6  cause" would obviously leave no role for the consideration of penalty information.

7      The Ninth Circuit previously rejected a claim based upon the proscription against

8  consideration of penalty information based upon the same unlikely reading of the word "should"

9  employed in Marcucci. See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).

10 Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the

11 passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning

12 in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.

13 The instructions again violate Vasquez, which plainly authorized consideration of penalty

14 information. See 474 U.S. at 263.

15     Nothing can mask the undeniable fact that Judge Burns explicitly instructed the jurors time

16 and time again that they had a duty, an obligation, and a singular prerogative to indict each and

17 every case where there was probable cause. These instructions go far beyond the holding of

18 Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.

19 Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire,

20 could possibly believe what the Supreme Court held in Vasquez:

21     The grand jury does not determine only that probable cause exists to believe that a
       defendant committed a crime, or that it does not. In the hands of the grand jury lies
22     the power to charge a greater offense or a lesser offense; numerous counts or a single
       count; and perhaps most significant of all, a capital offense or a non-capital offense –
23     all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict
       in every case where a conviction can be obtained."
24

25 474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly,

26 J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls

27 not only the initial decision to indict, but also significant decisions such as how many counts to

28 charge and whether to charge a greater or lesser offense, including the important decision whether

1  to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was

2  empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not

3  Vasquez's grand jury. The instructions therefore represent structural constitutional error "that

4  interferes with the grand jury's independence and the integrity of the grand jury proceeding." See

5  United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be

6  dismissed. Id.

7       The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the

8  instructions' excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion --

9  its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of

10  its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's

11  instructions may have on a grand jury because "it is the *structure* of the grand jury process and its

12  *function* that make it independent." Id. at 1202 (emphases in the original).

13       Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that

14  the 'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and

15  unreviewability of many of its decisions -- sufficiently protects that power." See id. at 1214

16  (Hawkins, J., dissenting). The flaw in the majority's analysis is that "[i]nstructing a grand jury that

17  it lacks power to do anything beyond making a probable cause determination ... unconstitutionally

18  undermines the very structural protections that the majority believes save[] the instruction." Id.

19  After all, it is an "'almost invariable assumption of the law that jurors follow their instructions.'"

20  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that "invariable assumption" were

21  to hold true, then the grand jurors could not possibly fulfill the role described in Vasquez. Indeed,

22  "there is something supremely cynical about saying that it is fine to give jurors erroneous

23  instructions because nothing will happen if they disobey them." Id.

24       In setting forth Judge Hawkins' views, Mr. Camacho-Melendez understands that this Court

25  may not adopt them solely because the reasoning that supports them is so much more persuasive

26  than the majority's sophistry. Rather, she sets them forth to urge the Court *not to extend* what is

27  already untenable reasoning.

28

1   Here, again, the question is not an obscure interpretation of the word "should", especially

2   in light of the instructions and commentary by Judge Burns during voir dire discussed above -

3   unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the

4   defense, but an absolute ban on the right to refuse to indict that directly conflicts with the

5   recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions.  Navarro-

6   Vargas II is distinguishable on that basis, but not only that.

7   Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly

8   states they enjoy.  He also excused prospective grand jurors who might have exercised that Fifth

9   Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that]

10   principle...."  See Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its

11   deliberations cannot embolden grand jurors who are no longer there, likely because they expressed

12   their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at

13   1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to

14   protect the accused from the other branches of government by acting as the 'conscience of the

15   community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The

16   federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand

17   jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both

18   fashioned his own rules and enforced them.

19   **D.   The Instructions Conflict with Williams' Holding That There Is No Duty to
        Present Exculpatory Evidence to the Grand Jury.**

20

21   In Williams, the defendant, although conceding that it was not required by the Fifth

22   Amendment, argued that the federal courts should exercise their supervisory power to order

23   prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure

24   required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a

25   general matter at least, no such 'supervisory' judicial authority exists."  See id. at 47.  Indeed,

26   although the supervisory power may provide the authority "to dismiss an indictment because of

27   misconduct before the grand jury, at least where that misconduct amounts to a violation of one of

28   those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to

1    ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted), it does not serve as

2    "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  <u>Id.</u> at 47

3    (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

4    initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the

5    defendant's claim, both as an exercise of supervisory power and as Fifth Amendment common law.

6    <u>See</u> <u>id.</u> at 51-55.

7         Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors

8    would present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

9         Now, again, this emphasizes the difference between the function of the grand jury
     and the trial jury.  You're all about probable cause.  If you think that there's evidence
10   out there that might cause you say "well, I don't think probable cause exists," then
     it's incumbent upon you to hear that evidence as well.  As I told you, in most
11   instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against
     what they may be asking you to do if they're aware of that evidence*.

12

13   <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and

14   their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear

15   in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters

16   presented to you."  <u>See</u> <u>id.</u> at 27.  The Ninth Circuit has already concluded it is likely this final

17   comment is "unnecessary."  <u>See</u> <u>Navarro-Vargas</u>, 408 F.3d at 1207.

18        This particular instruction has a devastating effect on the grand jury's protective powers,

19   particularly if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow

20   concluded was not conveyed by the previous instruction: "You're all about probable cause."  <u>See</u>

21   Ex. A at 20.  Thus, once again, the grand jury is reminded that they are limited to probable cause

22   determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had

23   already told the grand jurors that they likely would be excused if they rejected this limitation).  The

24   instruction goes on to tell the grand jurors that they should consider evidence that undercuts

25   probable cause, but also advises the grand jurors that the prosecutor will present it.  The end result,

26   then, is that grand jurors should consider evidence that goes against probable cause, but, if none is

27   presented by the government, they can presume that there is none.  After all, "in most instances, the

28   U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you

1  to do if they're aware of that evidence." <u>See</u> <u>id.</u> Moreover, during voir dire, Judge Burns informed

2  the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something

3  adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that.*" <u>See</u>

4  Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would

5  have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the

6  U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act

7  in good faith in all matters presented to you." <u>See</u> Ex. A at 27.

8          These instructions create a presumption that, in cases where the prosecutor does not present

9  exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which

10  no exculpatory evidence was presented, would proceed along these lines:

11          (1)  I have to consider evidence that undercuts probable cause.

12          (2)   The candid, honest, duty-bound prosecutor would, in good faith, have presented any

13                such evidence to me, if it existed.

14          (3)   Because no such evidence was presented to me, I may conclude that there is none.

15  Even if some exculpatory evidence were presented, a grand juror would necessarily presume that

16  the evidence presented represents the universe of all available exculpatory evidence; if there was

17  more, the duty-bound prosecutor would have presented it.

18          The instructions, therefore, discourage investigation -- if exculpatory evidence were out

19  there, the prosecutor would present it, so investigation is a waste of time -- and provide additional

20  support to every probable cause determination: i.e., this case may be weak, but I know that there is

21  nothing on the other side of the equation because it was not presented. A grand jury so badly

22  misguided is no grand jury at all under the Fifth Amendment.[8]

23

24          [8]  Judge Moskowitz has recently ruled on a motion similar to that filed by Mr. Camacho-
25  Melendez. <u>See</u> <u>United States v. Martinez-Covarrubias</u>, Case No. 07CR0491-BTM, Order Denying
    Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (attached hereto as Exhibit
26  C). While Mr. Camacho-Melendez disagrees with Judge Moskowitz's analysis, Judge Moskowitz
    at least recognizes that a portion of the instruction is error, although he incorrectly found that it was
27  not structural. Ex. C at 11. Because, under Judge Moskowitz's analysis, this Court must determine
    whether the error was harmless, Mr. Camacho-Melendez asks that this Court order the government
28  to produce the transcripts of the grand jury proceedings that resulted in the instant indictment. The
    Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that

## IV.

## **LEAVE TO FILE FURTHER MOTIONS**

Mr. Camacho-Melendez and defense counsel have received **55** pages of discovery in this case. As new information surfaces – via discovery provided by government, defense investigation, or an order of this court – the defense may need to file further motions, or to supplement existing motions. For this reason, defense counsel requests leave to file further motions.

## V.

## **CONCLUSION**

For the reasons stated, Mr. Camacho-Melendez requests that this Court grant his motions.

Respectfully Submitted,

/s/ *Kasha K. Pollreisz*

Dated: April 1, 2008        **KASHA K. POLLREISZ**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Camacho-Melendez
Kasha_Pollreisz@fd.org

---

a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The Ninth Circuit requires a "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the standard set for in Rule 6(e)(3)(E)(ii): Mr. Camacho-Melendez need only show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added). That is why the Rule's "general suggestion [is] in favor of disclosure." See Walczak, 785 F.2d at 857. Here, under Judge Moskowitz's approach to Judge Burns' erroneous instruction, it is clear that, at the very least, "a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii).